**Morris MARTIN, Petitioner-Appellant,**

v.

**Dale E. FOLTZ, Respondent-Appellee.**

**No. 84–1359.**

United States Court of Appeals,
Sixth Circuit.

Argued July 18, 1985.

Decided Sept. 30, 1985.

Arthur J. Tarnow (argued), Detroit, Mich., for petitioner-appellant.

Frank J. Kelley, Atty. Gen. of Mich., Lansing, Mich., Rosemary A. Gordon (argued), John O'Hair, Edward Reilly Wilson, Detroit, Mich., for respondent-appellee.

Before CONTIE, WELLFORD and MILBURN, Circuit Judges.

MILBURN, Circuit Judge.

Petitioner-appellant, Morris Martin, appeals the decision of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner argues that multiple constitutional violations were committed in the Michigan state court trial in which he was convicted by a jury of first-degree murder and sentenced to life imprisonment. As we agree with the district court's holdings on all issues, we affirm.

## I.

### A. FACTS

Martin's state court conviction for first-degree murder stems from the shooting death of one Archie Walker. On the evening of November 1, 1973, Walker arrived at the Detroit Metropolitan Airport having returned from a business trip to California. Walker's car was parked on the second floor of an open air parking deck located near the main airport terminal, and he had walked to his car before his death.

Witness Susan Wooding testified at Martin's trial that on the evening of November 1, 1973, she saw two black men dressed in bluish-gray coveralls standing next to the stairwell on the second floor of the parking deck at the Detroit Metropolitan Airport. As she drove her car down the ramp of the parking deck, she saw the same two men holding onto a third man later identified as Archie Walker. Walker was screaming for help, and the two men had their hands pressed to his midsection. As she approached them in her vehicle, she heard shots and saw Walker slump over. After she drove past them, she saw a third black man wearing similar coveralls running about five or six car widths away from Walker. As she exited the garage, Wooding reported the incident to the parking attendant, who contacted the police.

Within minutes police officers arrived at the scene of the shooting. Wayne County Deputy Sheriff Marvin Wade testified that he ran from the airport terminal across an overpass to the scene of the crime and ordered the other officers to search the area. He then saw Morris Martin about twenty-five (25) feet away, walking toward an exit. Although an employee of the United States Weather Bureau testified that with the wind chill the temperature at the Metropolitan Airport was thirty-four degrees (34°) and other witnesses testified that it was a cold night, Martin was wearing only a short-sleeved shirt and no coat. Wade asked Martin where he was going and where he had come from, to which Martin responded that he was going to the terminal and that he had just come from his car, a blue Ford. Martin told Wade his name was "Clarence Martin," but stated that he had no identification as he had "left everything at home." Wade then left Mar-

tin with Sergeant Yarber and checked the area of the parking deck indicated by Martin for a blue Ford. Although he found several Fords, he checked the registrations, and none were issued to Martin.

After Wade left, Martin told Sergeant Yarber that his name was "Charles Martin." Yarber placed Martin in the back seat of his car and read him his *Miranda* rights. Although Yarber's testimony is not entirely clear, it appears that Martin again made statements about a blue Ford after being Mirandized. Yarber testified that, "We drove him around in the scout car looking for the vehicle he was telling us he came from, and we never found it." The prosecutor asked, "Did he ever direct you to any certain car?" Yarber answered, "No, he sat back there and we were waiting for him to point something out, and he never did."

Bruce Durbish, a guard at Metropolitan Airport, testified he saw a U-Haul van, "too big to fit in the parking deck," parked on the first level. A 1966 turquoise Ford was parked near the van. Earlier that same evening Durbish had seen three black men in coveralls in the 1966 Ford. At some point the van was moved and because of its height it became wedged against the ceiling. Durbish and Bob Fowler helped let the air out of the tires in order to attempt to move the van. ·

Jordan Booth, an inspector with the Wayne County Sheriff's Department, testified that after the shooting he found three pairs of coveralls and a gun inside the van. Detective Sergeant Charles Walker of the Wayne County Sheriff's Department later searched the U-Haul van and found Martin's wallet and a key which fit the deceased's car. The wallet contained a card authorizing Martin to obtain three pairs of coveralls from the Ford Motor Company where Martin worked. The police also searched the 1966 turquoise Ford and found a .38 caliber pistol which proved to be the murder weapon.

Herbert Lutz, an identification technician with the Wayne County Sheriff's Office, identified at trial different items of evidence found in the U-Haul van. These items included the three pairs of bluish-gray coveralls, clothing, a jacket, shoes, gun, handcuffs, sharp pointed screw drivers "ground down as an ice pick," and some sixty (60) to seventy (70) individual pieces of evidence. He identified the .32 caliber six-shot revolver found in the van, and also identified Martin's wallet and driver's license found in the van. Additionally, he identified the Smith and Wesson .38 caliber six-shot revolver with three live and three spent rounds found lying on the front seat of the blue or turquoise 1966 Ford.

## B. PROCEDURAL HISTORY AND ISSUES RAISED ON APPEAL

On February 26, 1974, petitioner Martin was convicted of first-degree murder by a jury following a trial in the Wayne County, Michigan, Circuit Court. He was sentenced to life imprisonment on March 19, 1974. Martin filed an appeal as of right in the Michigan Court of Appeals on March 22, 1974. His conviction was affirmed on July 24, 1975. *People v. Martin*, No. 19794 (Mich.Ct.App.1975) (*per curiam*). An application for leave to appeal to the Michigan Supreme Court was denied on June 8, 1976. *People v. Martin*, 397 Mich. 883 (1976). Martin then filed a delayed motion for new trial (application for leave to file a motion for new trial) in the Wayne County Circuit Court on December 26, 1980. The motion was denied in an order dated August 27, 1981. (Docket No. 75–58515). On November 2, 1981, the Michigan Court of Appeals denied Martin's application for leave to appeal. (Docket No. 59239). The Michigan Supreme Court denied Martin's application for leave to appeal on June 29, 1982. *People v. Martin*, 413 Mich. 943 (1982). No issues of procedural default or exhaustion are raised in this appeal.

Thereafter, Martin filed his section 2254 petition for habeas corpus on September 10, 1982. Following the district court's denial of his petition, Martin filed this appeal raising the following issues:

(A) Whether Martin's fourteenth amendment due process rights under *Doyle v.*

*Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), were violated by the prosecutor's elicitation of testimony that Martin was silent during the search for the blue Ford.

(B) Whether Martin was denied fourteenth amendment due process by virtue of prosecutorial misconduct stemming from alleged prejudicial comments by the prosecutor.

(C) Whether sufficient evidence for conviction beyond a reasonable doubt was presented on the issue of premeditation.

(D) Whether Martin was denied fourteenth amendment due process by the jury instruction on premeditation.

(E) Whether the state court erroneously shifted a burden of proof to Martin in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), by stating in its charge that malice may be implied.

(F) Whether Martin's fourteenth amendment due process rights were violated by the admission of evidence that Martin had given false exculpatory evidence.

## II.

### A. DOYLE ISSUE

■ Martin further argues that his fourteenth amendment due process rights under *Doyle* were violated by the prosecutor's elicitation of testimony that he was silent during the search for the blue Ford and the prosecutor's later use of this testimony during arguments on petitioner's motion for a directed verdict and during closing arguments. Although Martin did not object to this evidence, the cause and prejudice standard is inapplicable because the state courts reached the merits in deciding this issue and did not rely on the procedural default. *See Hockenbury v. Sowders,* 620 F.2d 111, 115 (6th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981).

■ Although the prosecutor's use of petitioner's silence following the reading of his *Miranda* rights, at the very least, approached the outer limits of fundamental fairness, *see Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (*per curiam*), we decline to reach this question because any error was harmless beyond a reasonable doubt. Numerous cases have held that a *Doyle* error may be harmless. *See, e.g., United States v. Blankenship,* 746 F.2d 233, 238 (5th Cir. 1984); *Young v. Rees,* 707 F.2d 935, 935–36 (6th Cir.1983) (*per curiam*); *Chapman v. United States,* 547 F.2d 1240, 1248 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Meeks v. Havener,* 545 F.2d 9, 10 (6th Cir.1976) (*per curiam*), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977). The truly incriminating part of the transaction was the police officers' inability to find the blue car in the second floor area Martin indicated. Also, the presence of Martin's identification (after Martin had told police he had left it at home) in the van containing the coveralls, handcuffs, sharpened screwdrivers and a gun, along with the presence of the murder weapon in the 1966 blue or turquoise Ford all are strongly probative of guilt. Thus, any isolated *Doyle* violation is harmless error beyond a reasonable doubt.

### B. COMMENTS BY THE PROSECUTOR

Martin complains of a number of assertedly prejudicial comments by the prosecutor. We will consider them separately.

#### (1)

Martin argues that a portion of the prosecutor's closing argument was an appeal to the jury's sense of civic duty to convict. The complained of portion contains the following statements:

[W]e would certainly hope that you folks would never find Morris Martin not guilty when we have a dead man who had every right to live and was captured ... by two men and killed almost immediately.

\*     \*     \*     \*     \*     \*

The liberty or whatever penalty, if any, attached is up to the Judge in this case.

The liberty is not at issue at all because when we start talking about that we must realize for every crime there is a victim, and there are relatives of victims. If we start talking about the liberty, we've got to talk about the internment of the deceased, and that is final. His liberty is forever sealed. He will never be free, Archie Walker. I don't want to start crying. I don't know the man. It is a pretty final judgment that has been rendered on Archie Walker. He will never get out of that pine box or whatever houses him in the ground. When we talk about liberty you realize there is a victim who will never be free to enjoy life again.

The state court rejected this claim of error in part because Martin did not object to these comments. Although the state does not now argue the issue, it appears that the procedural default was a "substantial basis" of the state court's decision and that Martin should be barred from presenting this claim absent a showing of "cause and prejudice." *See Hockenbury v. Sowders,* 620 F.2d 111, 114–15 (6th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981). The district court adopted the state court's analysis that the statements were harmless error. The district court further held that the state court finding of harmless error was "binding."

■ The district court's opinion is incorrect on this point. First, state court findings of fact are not binding, but are entitled only to a presumption of correctness under 28 U.S.C. § 2254(d). *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1308, 71 L.Ed.2d 480 (1982) (*Sumner II*) ("the federal courts are not necessarily bound by the state court's findings"). Second, the only authority cited by the district court was *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (*Sumner I*), and *Sumner II, supra.* These cases do not hold that harmless error is a question of pure fact.

In *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the Supreme Court stressed the narrow scope of a court's habeas corpus review:

This is not a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights, such as a right to counsel ... or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.... When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them. But here the claim is only that a prosecutor's remark about respondent's expectations at trial by itself so infected the trial with unfairness to make the resulting conviction of denial of due process.

*Id.* at 643, 94 S.Ct. at 1871. The Court held that the due process question is whether the misconduct constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." *Id.* at 642, 94 S.Ct. at 1871 (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941)).

In *Angel v. Overberg,* 682 F.2d 605 (6th Cir.1982) (*en banc*), this court expanded on the *Donnelly* standards. To warrant habeas relief, the prosecutor's statements "must be so egregious as to render the trial fundamentally unfair." *Id.* at 608. This determination must be made on a case-by-case basis, examining "the totality of the circumstances." *Id.* Factors relevant in making this inquiry are: the degree to which the remarks may tend to mislead the jury and to prejudice the accused; whether the remarks were isolated or extensive; whether they were deliberately placed before the jury; and the strength of the case against the accused. *Id.* Finally, this court noted the "extreme nature of prosecutorial misconduct required for a federal court to issue the writ." *Id.* at 609 (quoting *Cook v. Bordenkircher,* 602 F.2d 117, 120 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979)).

■ Under these standards, we find no prejudicial error which would require the issuance of the writ in this case. First,

although an emotional appeal such as the one made by the prosecutor in this case may be improper, it was isolated in the context of the entire trial. Second, an examination of the cases that have not found a constitutional violation reveals that more is necessary than what occurred in the instant case to justify issuing the writ. *See, e.g., Webster v. Rees*, 729 F.2d 1078 (6th Cir.1984) (prosecutor repeatedly called petitioner a liar, displayed a gun that had not been admitted into evidence, and referred to it as a "Saturday Night Special"; held, not so egregious to justify issuance of the writ). Finally, the proof against Martin was relatively strong.

#### (2)

Martin's second argument is that "the prosecutor was permitted to advance the sheerest speculation to the jury that the assailants intended to torture the victim." We agree with the district court and the state court that this argument was a permissible inference from the evidence. As stated in the facts of this opinion, there were two sets of handcuffs (inferring one for the wrists and the other for the ankles) and sharpened screwdrivers ("ground down as an ice pick"), which facts support such an inference. Therefore, we find no merit in this argument. A prosecutor is permitted a certain degree of latitude in summation. *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir.1977).

#### (3)

Martin also complains that the prosecutor's theory of the case was that the assailants intended to kidnap Walker, but that they killed him when he resisted. Martin argues that although the indictment alleged murder and neither kidnapping nor felony murder, he had to defend a felony murder case. Martin insists this prosecutorial argument violated the notice requirement of the due process clause of the fourteenth amendment of the federal constitution. This argument is without merit.

First, the jury was only instructed on murder, not felony murder and it could not,

therefore, have convicted Martin on an uncharged felony murder theory. Second, Martin identifies no evidence that was made admissible only by virtue of the prosecutor's theory. The only case relied upon by Martin, *Watson v. Jago*, 558 F.2d 330 (6th Cir.1977), is distinguishable. In that case, the petitioner had been indicted only for first-degree murder. However, the state trial court allowed the prosecution to openly state that it planned to proceed on a felony murder charge and spend much time proving the predicate felony. In this case, however, the prosecutor did not attempt to prove the elements of a kidnapping offense but instead relied upon evidence admissible for the murder charge in arguing to the jury how it was that Martin came to kill Walker. There was no constructive amendment of the indictment at trial as there was in *Watson. See id.* at 335–36.

### C. SUFFICIENCY OF THE EVIDENCE ON PREMEDITATION

Martin was convicted of first-degree murder. An element of first-degree murder is premeditation. Martin argues that the prosecution's own theory of the case tends to show that there was no premeditation. In essence, Martin argues that at most the evidence shows that he participated in a plan to kidnap Walker and that the killing was not a part of the plan. Rather, the killing came about upon a spontaneous reaction to Walker's resistance to the kidnapping.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Court held that habeas corpus relief is appropriate for constitutionally insufficient evidence. The test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original).

Martin's argument is without merit. The hypothetical rational juror could have found beyond a reasonable doubt that the plan was not merely to kidnap Walker and

hold him unharmed. Rather, that juror could have found beyond a reasonable doubt that the plan was to grab Walker, take him to some distant location and kill him. The evidence that three well-armed men who were dressed in "hard to trace" coveralls over their street clothing and who had both a car and a van equipped with guns, handcuffs and sharpened screwdrivers supports a reasonable inference that Martin and his two companions planned to kill Walker.

## D. INSTRUCTION ON PREMEDITATION

Martin argues that the trial court failed to define sufficiently the concepts of premeditation and deliberation, which are the elements which distinguish first-degree murder from second-degree murder. The trial court instructed the jury as follows:

> Murder is divided into two degrees, First and Second. The difference between Murder in the First Degree and Murder in the Second Degree is that in Murder in the First Degree there must be a premeditation and deliberation and such a lapse of time as will give the mind time to calculate the purpose and intent of the killing.

> Murder in the Second Degree is where there is malice, but which arises all of a sudden previous to the killing. In such a case it would be malice aforethought and not premeditation as calculated malice, and the offense would be second degree.

In attempting to transform this essentially state law claim into a federal constitutional claim, Martin raises a two-pronged argument. First, he analogizes undefined terms in jury charges to unconstitutionally vague statutes. Second, he argues that an instruction containing undefined terms may operate to relieve the state of a burden of proof in violation of cases such as *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

We reject Martin's argument. First, the requirement of premeditation was not left completely undefined. The instruction distinguished between first-degree murder, which requires "such a lapse of time as will give the mind time to calculate the purpose and intent of the killing" and second-degree murder, in which the malicious intention "arises all of a sudden previous to the killing." The instruction language captures, admittedly in an abbreviated form, the essential distinction in Michigan law between first- and second-degree murder. *See, e.g., People v. Hoffmeister*, 394 Mich. 155, 229 N.W.2d 305 (1975). Moreover, a collateral attack on a state jury instruction proceeds under a very narrow scope of review:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process" ... not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,'" ....

*Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977) (footnote and citations omitted). The Supreme Court also stated that "[a]n omission, or an *incomplete instruction*, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155, 97 S.Ct. at 1737 (emphasis supplied).

Reviewing the instruction on premeditation under the *Kibbe* standard, we find no constitutional violation. First, there is no affirmative misstatement of law but rather a mere asserted omission. Second, the language of the instruction did provide a basis for distinguishing between first- and second-degree murder on the basis of premeditation. Third, it should be noted that the Court found no constitutional violation in *Kibbe*, where the state trial court's instruction completely failed to state causation as an element of the offense. In contrast, in the instant case all the elements of the offense were stated.

The only question is the definition of one of the elements. Under the circumstances, we hold that no error of constitutional magnitude occurred.

## E. INSTRUCTION ON MALICE

The trial court instructed the jury that malice is an element of both first- and second-degree murder. *See* App. at 194. In defining the term malice, the court stated, "Malice is implied from any guilt or cruel [sic] against another however sudden." *Id.* at 195. Martin argues that this instruction shifted a burden of proof to him in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We are of the opinion that the district court correctly ruled that this issue is controlled by *Engle v. Koehler*, 707 F.2d 241 (6th Cir.1983), *aff'd by an equally divided Court*, — U.S. —, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984) (*per curiam*), and *Conway v. Anderson*, 698 F.2d 282 (6th Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3092, 77 L.Ed.2d 1352 (1983). In these two cases, this court held that a *Sandstrom* instruction may be harmless error:

> In *Conway*, this court held that the prejudicial effect of a *Sandstrom* instruction is largely a function of the defense asserted at trial. If the defendant acknowledges that an intentional, malicious killing occurred and only claims non-participation, then a *Sandstrom* instruction may be harmless. Conversely, if the defendant asserts lack of *mens rea*, a *Sandstrom* instruction can be extremely prejudicial even if overall proof of intent or malice is substantial.

*Engle, supra,* 707 F.2d at 246. In *Conway*, this court held:

> While application of "harmless error" analysis to a *Sandstrom* instruction must comport to the unique facts of the record, the weight of authority counsels that the corrupting effect of a *Sandstrom* instruction is to a great extent a function of the defense, if any, interposed at trial.... Under circumstances where the defense challenges the element of *mens rea*—for example, where a

defense of lack of requisite intent is affirmatively asserted at trial—a *Sandstrom* instruction which serves to frustrate this defense possesses the capability of being extremely prejudicial.... Similarly, where the defense advanced challenges the prosecution's failure of proof of intent beyond a reasonable doubt, a *Sandstrom* instruction has been adjudged harmful simply because it "may have relieved the state of its obligation" even though the overall proof was substantial....

> Contrawise, however, where a defense of non-participation in the criminal act is urged at trial, such as alibi or mistaken identity, thereby accenting the physical rather than the *mens rea* element of the crime, the effect of a *Sandstrom* instruction as a factor upon which the verdict was predicated may diminish, particularly where the conduct or nature of the criminal offense, as reflected in the record, firmly negates any reasonable possibility that the perpetrator of the crime, whoever it may have been, lacked the requisite intent or malice.

*Conway*, 698 F.2d at 285.

■ Assuming that the statement that "malice is implied" violated *Sandstrom*, the error was clearly harmless under *Engle* and *Conway*. The sole question at the trial of this case was whether Martin was a participant in the crime, not whether he acted with any particular intent. Indeed, as the district court noted, under the facts of this case, "an inference of malice was inescapable." App. at 20. As the court stated in *Conway*, the "*Sandstrom* instruction cannot be adjudged by even the most fertile imagination to have contributed to the convictions." 698 F.2d at 286. Accordingly, even assuming the instruction to have been erroneous, the error was harmless beyond a reasonable doubt.

## F. FALSE EXCULPATORY STATEMENTS

At trial, the prosecution introduced evidence as part of its case in chief that Martin, upon encountering the police and

being arrested, made false statements in an attempt to exculpate himself. In addition to the blue Ford statements considered above, the prosecution introduced evidence that Martin gave false names and that he claimed that he left his identification at home when it was found later in the 1966 Ford on the first level of the parking deck.

 Martin argues that offering false exculpatory statements as substantive evidence of guilt denied him a fair trial and violated due process. However, such false exculpatory statements are probative of a guilty conscience and hence of guilt and are admissible. *See United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975). *See generally,* 2 *J. Wigmore, Evidence* § 278 (2) (3d ed. 1940). Nevertheless, Martin also argues in a broader sense that since the prosecution's case apart from the false exculpatory statements was rather weak, insufficient evidence supported his conviction. There is authority that on a direct appeal in a federal criminal case a conviction supported by false exculpatory statements and an otherwise weak case rests upon insufficient evidence. *See Johnson, supra,* 513 F.2d at 824. However, as previously stated, the issue in a habeas corpus proceeding is whether "any" rational trier of fact could find Martin guilty beyond a reasonable doubt.

As concluded above, the court has found that a rational trier of fact could find beyond a reasonable doubt that Martin was guilty of premeditated murder. The state's case, even apart from the false exculpatory statements, was not weak. A rational juror could find that the discarded van was used by the assailants because of the coveralls in the back of the van. A rational juror could then find that Martin was one of the assailants because his wallet was found in the back of the van. Additionally, Martin was found near the scene of the crime wearing no coat. This would support an inference by a rational juror that Martin had no coat because he had been wearing the coveralls found in the back of the van. This evidence, in addition to the evidence that Martin acted in a manner consistent with one displaying a guilty conscience, clearly provides constitutionally sufficient evidence to support the conviction.

### III.

The judgment of the district court dismissing the petition for habeas corpus is AFFIRMED.