968 F.2d 1216
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sergio M. DAMIANI, Defendant-Appellant.
 No. 91-4147.
 United States Court of Appeals, Sixth Circuit.
 July 21, 1992.
 
 Before BOYCE F. MARTIN, Jr. and SUHRHEINRICH, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Sergio Damiani is a Yugoslavian immigrant who makes his living selling jewelry from his home in Columbus, Ohio. In December 1990, James Bartlett sent Damiani two shipments of diamonds that Bartlett had stolen from his employer, KMA Sunbelt, Inc. ("KMA"). Damiani rejected the first but accepted the second for a price of $2,200--less than half their wholesale price.
 
 
 2
 In February 1991, Bartlett stole more than $60,000 worth of diamonds from KMA. He again contacted Damiani, who instructed Bartlett on how to ship the jewels and how the return payment to Bartlett would be made. Bartlett sent the stolen diamonds in two shipments. On March 1, 1991, Bartlett received $5,200 from Damiani for the first shipment, which was worth $10,000-$15,000, and sent the remaining diamonds. That same day, Bartlett was arrested in Florida.
 
 
 3
 After posting bond, Bartlett contacted Damiani on at least three occasions. Although he did not state that he had been arrested or tell Damiani that the diamonds were stolen, he did indicate that he was "scared." Damiani advised Bartlett to stay calm and to rent a number of post office boxes throughout the St. Petersburg area to receive further payments. Bartlett asked Damiani to corroborate an alibi he had concocted in the event any of the payments were intercepted. Bartlett asked Damiani to state that he was returning the deposit that Bartlett had made on a Rolex watch. Damiani told Bartlett not to worry and instructed him on how to avoid detection.
 
 
 4
 Bartlett was arrested again on March 20, 1991, and spent forty-seven days in jail. Bartlett's wife Jennifer decided to cooperate with the police. She agreed to allow the police to monitor and record her telephone calls to Damiani, whom Bartlett told her to call if he were arrested. She called Damiani on March 23, 1991, identified herself as "Jim's girlfriend," and informed Damiani that she and Jim had been arrested "for stolen jewelry." Damiani instructed her to destroy the envelopes in which he had sent them payment for the previous shipments. He then offered to send money to cover Jim's bond as well as "spending money" for Jennifer. He told her to say, if asked, that the money represented a deposit Jim had left on a Rolex watch.
 
 
 5
 After Jim was released, he too agreed to cooperate with the authorities. He called Damiani who agreed to accept another shipment of diamonds. On May 10, 1991, the F.B.I. made a controlled delivery of diamonds and a ring. Less than two hours after this controlled delivery was accepted, the F.B.I. searched Damiani's home. They found the package opened. Four of the diamonds were discovered in Damiani's shirt pocket and one had been mounted on a ring.
 
 
 6
 Damiani was arrested and charged with violating 18 U.S.C. §§ 2 & 2315 by receiving, possessing, concealing, storing, selling, or disposing of at least $5,000 worth of stolen jewelry that crossed state lines after being stolen. His defense was that he did not know the jewelry was stolen. The indictment was brought in four counts, the first dated February 26, 1991, the second March 1, 1991, the third March 23, 1991, and the fourth May 10, 1991. These indictments were not intended to indicate four distinct instances of criminal conduct, but rather to reflect the additional evidence of Damiani's knowledge that the government had accumulated by the date listed in the particular count. The jury convicted Damiani only of the last two.
 
 I. Prosecutorial Misconduct
 
 7
 Damiani first contends that the prosecutor's closing argument included remarks that are unsupported by the record. Specifically, Damiani challenges two comments: "That's what he does for a living, he buys stolen jewelry" and "What happened in this case is quite simply that Sergio Damiani got caught doing what he has been doing for ... fifteen years as a jeweler."
 
 
 8
 Damiani's trial counsel failed to object to either of these statements. Consequently, we review for plain error. Plain error is an exacting standard that is not met by all harmful errors. To be plain error, an error must be not only harmful but also "so rank that [it] should have been apparent to the trial judge without objection, or ... strike[s] at the fundamental fairness, honesty or public reputation of the trial." United States v. Phillips, 888 F.2d 38, 41 (6th Cir.1989) (citation omitted).
 
 
 9
 The prosecutor's comments do not constitute plain error; they do not appear erroneous at all. In her summation, the prosecutor may state the inferences that she wishes the jury to draw from the evidence and "is permitted a certain degree of latitude" in doing so. Martin v. Foltz, 773 F.2d 711, 717 (6th Cir.1985), cert. denied, 478 U.S. 1021 (1986).
 
 
 10
 In addition, we must view the challenged comments in the context of the entire summation. The gravamen of these comments is that Damiani is knowingly engaged in the business of selling stolen jewels. The prosecutor noted that while Damiani claimed to have concluded sales totaling millions of dollars, his records showed that his legitimate sales were far more modest. The prosecutor also spoke of Damiani's frequent instructions to the Bartletts on how to avoid detection and what to do if arrested. In addition, she argued the implausibility of Damiani's belief that the jewels he dealt with were not stolen given that he routinely paid half or less of their wholesale value. All of this evidence was in the record and would support a conclusion that Damiani was experienced in the business of selling stolen jewels. See Martin, 773 F.2d at 717; United States v. Felix, 867 F.2d 1068, 1075 (8th Cir.1989); cf. United States v. Moreno, 899 F.2d 465, 468 (6th Cir.1990).
 
 II. Evidentiary Issues
 
 11
 * At trial the government contended, inter alia, that Damiani must have known the diamonds were stolen because the price he paid was half or less of wholesale. Damiani countered that he often purchased diamonds legitimately at less than wholesale. In support, Damiani offered evidence that he had purchased for $28,000 a model of the Taj Mahal made of gold and diamonds with an appraised value of $365,000 and sold it for $68,000. The district court refused to admit this evidence holding it irrelevant.
 
 
 12
 This ruling was correct. First, the prosecution's argument was based on purchases made below wholesale cost while the Taj Mahal transaction dealt only with a purchase made below appraised value. It therefore was not relevant to the point at issue. Moreover, relevancy requires that the items be comparable. As we have stated in the context of real property valuations, comparability "does not mean identity" but "does mean, at the very least, similarity in many respects." United States v. 103.38 Acres of Land, 660 F.2d 208, 211 (6th Cir.1981) (citation omitted). The value of a loose diamond is determined by the physical characteristics of that diamond. The value of the miniature Taj Mahal is a much more complicated equation. Its value also derives from the value of the other component materials, such as gold, from the quality of its workmanship, the accuracy of its depiction of the actual Taj Mahal, and its aesthetic appeal. Given that the Taj Mahal's value is so remotely a function of the physical characteristics of the constituent diamonds and rests so heavily on ephemeral preferences, such as aesthetic appeal, the fact that the price of a model Taj Mahal varies wildly from an appraisal sheds no light on the variation between price and appraised value, let alone wholesale value, of a loose diamond.
 
 B
 
 13
 FBI agent DiPaolo had testified that Damiani was the subject of other FBI investigations into stolen property. Damiani claims that he should have been allowed to present evidence of his prior cooperation with the FBI to rebut DiPaolo's statement. It is impossible to fathom how Damiani's prior cooperation with the FBI could disprove DiPaolo's testimony, and Damiani offers no insight beyond the blanket assertion that it would. Therefore, the District Court did not err in refusing to admit this evidence.
 
 
 14
 Damiani also claims that the district court should have stricken DiPaolo's statement regarding previous FBI investigations of Damiani. Not only was there no objection, the statement was made in response to a question propounded by Damiani's counsel. We are not persuaded that the failure to strike this statement constitutes plain error. See United States v. Kirby, 838 F.2d 189, 191 (6th Cir.1988); United States v. Terry, 729 F.2d 1063, 1070-71 (6th Cir.1984).
 
 C
 
 15
 Damiani also challenges a portion of Arthur Domres's testimony. Domres was hired as an expert by the FBI to assist in identifying jewelry during the search of Damiani's residence. Domres testified regarding the process of imprinting a maker's mark on jewelry for purposes of identification. Specifically, Domres testified that many rings found in Damiani's home bore no maker's mark, that Damiani possessed equipment that could be used to remove maker's marks, and that rings lacking maker's marks were found next to this equipment. Again, Damiani's trial counsel failed to make a timely objection to this testimony.
 
 
 16
 Evidence regarding the equipment was plainly admissible. We have consistently upheld the admission of evidence relating to criminal paraphernalia, even though that paraphernalia may also have a legitimate purpose. See, e.g., United States v. Rey, 923 F.2d 1217, 1221-22 (6th Cir.1991).
 
 
 17
 Domres's testimony regarding the jewelry presents a more difficult issue. The government failed to establish that any of the rings ever bore a maker's mark let alone that any was stolen. As such, this evidence lacked a proper foundation and should not have been admitted. Nevertheless, its admission was harmless, rather than plain, error. See United States v. Reed, 647 F.2d 678 (6th Cir.), cert. denied, 454 U.S. 837 (1981). In Reed, the defendant was tried for receiving stolen goods. The government introduced an array of evidence showing the defendant's close association with known burglars and "fences" as well as his membership in a club frequented by such individuals. Id. at 686. The Reed court found the error harmless due largely to the strength of the properly admitted evidence. Id. at 867. Likewise, the evidence against Damiani is substantial. It includes the testimony of his accomplice and tape recorded self-incriminating statements made by Damiani. These same facts were present in Reed and led the court to "the unswerving conclusion that had the [testimony] never occurred the result would have been the same, and therefore any error was harmless." Id.
 
 
 18
 Finally, again with respect to the equipment, Damiani's trial counsel attempted to elicit testimony relating to the legitimate uses of such devices. The district court alerted counsel that pursuing the line of questioning could open the door to a videotape on the subject produced by the FBI that the court had previously refused to admit. Damiani describes this as a threat by the district court.
 
 
 19
 If relevant, the videotape was admissible. See, e.g., United States v. Ginsberg, 758 F.2d 823, 830 (2d Cir.1985). Far from being a threat, the court's admonition was a helpful reminder to counsel of the possible consequences of his questioning. Recognizing this, Damiani's trial counsel made the tactical decision to abandon the line of questioning. We will not reverse on the grounds of a tactical decision by counsel. United States v. Arnold, 890 F.2d 825, 828 (6th Cir.1989).
 
 D
 
 20
 Damiani took the stand in an attempt to persuade the jury that he did not knowingly deal in stolen merchandise. To this end, his trial counsel asked whether he "ever had a problem with receiving merchandise that was alluded to as stolen from another jeweler." Damiani responded:
 
 
 21
 In five years time, I accidentally got myself involved into a system of half carat diamond that a son stole from his mother and I give it back to her. There was no police or nobody involved. She called me and I give her the stone back, and I think I paid $300. It was four incidents in about five years, including a Rolex watch. Somebody, I pay $1,600, and I sold it to another friend of mine, another jeweler for $1,800, and the guy dropped it, took it in the jewelry store, but all of the Rolex usually had my name on it. I put my name on the Rolex.
 
 
 22
 On cross examination, the government sought to rebut Damiani's contention that he was only accidentally involved in trafficking stolen merchandise. The prosecutor inquired whether Damiani continued to purchase jewelry from the person who sold him the stolen Rolex. Damiani disclosed that he had. Damiani's counsel objected on the grounds that this testimony was irrelevant. However, it is patently relevant impeachment as it tends to rebut Damiani's assertion that he was only accidentally involved in selling stolen merchandise. Moreover, this represents other acts evidence that, though not admissible for its own sake, is admissible to prove that Damiani knew he was dealing in stolen jewelry. Fed.R.Evid. 404(b).
 
 E
 
 23
 Carlos Urena, KMA's co-owner and vice-president, testified that Eugene Sergio, an investigator employed by Damiani, traveled to Florida to look into the allegations against Damiani. Urena testified that Sergio told him the diamonds stolen from KMA were in Damiani's apartment when it was searched but the FBI agents were not able to identify them. Assuming arguendo that this testimony constitutes hearsay, see Mitroff v. Xomox Corp., 797 F.2d 271, 276 (6th Cir.1986); Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir.1983), Damiani's trial counsel failed to preserve this issue for appeal. The admission of this statement, if error at all, was harmless error for the other evidence against Damiani was, as we have reiterated, overwhelming.
 
 III. Jury Instructions
 
 24
 The district court's charge to the jury included two instructions that Damiani now challenges. Since he failed to object at trial, we review for plain error.
 
 
 25
 The first instruction informed the jurors that they could infer Damiani's knowledge from surrounding circumstances, including the possession of recently stolen property. The instruction is in all respects an accurate statement of law and Damiani does not argue otherwise. He contends that the district court should have told the jury it was not required to draw such an inference and that the government bore the burden of proof. This argument is unavailing as the court did instruct the jury that it was not required to infer knowledge: "[p]ossession of recently stolen property is a circumstance from which you may, but are not required to, infer that the person in possession of it knew the property was stolen." (Emphasis added.)
 
 
 26
 Second, the court instructed the jury that evidence regarding the rings that lacked maker's marks could only be considered as evidence of Damiani's knowledge or intent. Damiani claims that the instruction should have been phrased more broadly to apply to any "other acts" evidence introduced under Fed.R.Evid. 404(b). The instruction was accurate as given, as Damiani concedes, and its clarity obviates any possibility that the jury was misled. Consequently, we find no plain error. See Howard v. Chesapeake & Ohio Ry. Co., 812 F.2d 282, 287 (6th Cir.), cert. denied, 484 U.S. 820 (1987).
 
 IV. Ineffective Assistance of Counsel
 
 27
 Damiani contends that his trial counsel was so incompetent as to violate his sixth amendment right to counsel. Generally, we will not consider a claim of ineffective assistance of counsel on direct appeal, as "the record of the trial court's proceeding is normally insufficient for evaluating counsel's performance." United States v. Swidan, 888 F.2d 1076, 1081 (6th Cir.1989) (citation omitted). There may well be perfectly reasonable strategic considerations to explain the decisions that Damiani now describes as incompetent. Given the absence of any record on this issue, it would be inappropriate for us to attempt appellate review.
 
 V. Sentence
 
 28
 The district court assessed a seven level enhancement to Damiani's base offense level on the grounds that the value of the diamonds he received was approximately $50,000. We will uphold the district court's findings at sentencing unless clearly erroneous. United States v. Moreno, 933 F.2d 362, 374 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). There was ample evidence to support the finding that the stolen goods had a value of at least $50,000. For instance, Keith Leclerc, president of KMA, testified that the stolen diamonds Damiani received cost KMA approximately $52,000.
 
 VI. Separate Convictions
 
 29
 The government concedes that it prosecuted Damiani for a single and continuous course of conduct and that it brought the indictment in four counts to reflect the accumulation of evidence over time. As a result, the government concedes that the convictions on counts 5 and 6 cannot both stand and that one must be vacated.
 
 VII. Conclusion
 
 30
 We affirm Damiani's conviction in all respects as to count 6 and remand with instructions to vacate his conviction on count 5. We also affirm the prison sentence, the term of supervised release, and the special conditions of the supervised release, including the fine and restitution, imposed pursuant to count 6. We remand with instruction to vacate the concurrent prison sentence and concurrent term of supervised release imposed pursuant to count 5.