**John MERLO, Petitioner-Appellee,**

v.

**Dan L. BOLDEN,
Respondent-Appellant.**

**No. 86–1118.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1986.

Decided Sept. 18, 1986.

Richard H. Browne, Asst. Pros. Atty., Pontiac, Mich., Margaret G. Horenstein (argued), for respondent-appellant.

Frank Lawrence (argued), Livonia, Mich., for petitioner-appellee.

Before KEITH and MERRITT, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

The Oakland County Prosecutor appeals from an order of the district court granting petitioner John Merlo's petition for a writ of habeas corpus. The district court found that Merlo's conviction for murdering his wife was obtained through a jury instruction which impermissibly shifted the burden of proof on the element of *mens rea* in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). For the reasons that follow, we affirm.

**I.**

On January 13, 1984, petitioner John Merlo filed a petition for a writ of habeas corpus alleging denial of effective assistance of counsel and violation of due process and the right to a fair trial with respect to five specific jury instructions. On December 20, 1967, Merlo was convicted of first-degree murder and sentenced to life imprisonment without possibility of parole. The conviction was affirmed, *People v. Merlo*, 23 Mich.App. 694, 179 N.W.2d 222 (1970), and, in 1975, a delayed application for leave to appeal was denied by the Michigan Supreme Court. At this point the alleged *Sandstrom* error on which the district court granted relief had not been raised. In 1977, Merlo filed a petition for writ of habeas corpus in federal district court but was unsuccessful.

The *Sandstrom* issue was first raised in Merlo's delayed motion for new trial on November 4, 1982, which was denied. On June 13, 1983, the Michigan Court of Appeals denied leave, and, on December 29, 1983, the Michigan Supreme Court denied leave to appeal.

At his trial, petitioner Merlo did not contest the fact that he shot his wife four times in the beauty shop where she was working. As defense counsel stated in a

pretrial motion, "the facts are such that the shooting is hard to be denied, and the defense must be that there was no premeditation." In his opening statement, defense counsel indicated that defendant's defense would be lack of premeditation.

Rose Marie Schmidt, a beauty shop customer, saw petitioner Merlo arrive at the beauty shop. Merlo and his estranged wife, Sharon, a hairdresser, went into the furnace room, located at the back of the beauty shop. According to Rose Marie, the doors to the furnace room were open and Merlo and his wife remained in the room for about five minutes. Rose Marie was five feet from the open doors but she did not hear any sounds. Sharon walked out of the room first and went to work on another customer. Rose Marie then saw Merlo walk out and shoot Sharon, firing two of the shots after Sharon was on the floor. Rose Marie observed that Merlo's gait was normal as he walked from the furnace room.

Another customer, Diane Brennan, also saw Merlo walk into the shop and go into the back room with his wife. Diane tried to listen to their conversation, but Merlo and his wife were very quiet. Diane also saw Merlo shoot his wife. She observed that Merlo was three to four feet from the victim, used a chrome pistol, and never said a word.

Andrea Pojarski was a hairdresser in the shop. She saw Merlo come in and exchanged casual greetings with him. Andrea heard Sharon ask him, "What are you doing here? Why don't you go home?" Andrea saw Sharon come out of the back room but did not see petitioner come out right after Sharon. Andrea heard the shots but did not watch the shooting.

Martha Stanfield owned the beauty shop. She knew Merlo and saw him come in. Although Merlo motioned for Sharon to come to the back room nothing appeared unusual. Prior to Merlo's arrival, Sharon had spilled water on the floor. Martha went into the back room while Merlo and Sharon were there to get towels. Merlo and Sharon were just standing there. At one point, Sharon came out of the back room, got a cigarette, and returned to the back room. Martha only heard Sharon use the word "car." Martha described Merlo's behavior that day as normal, quiet and courteous. She did not see any spit on Merlo's face nor any slap marks. Martha testified that police detectives were watching the beauty shop for a few weeks prior to the murder because Merlo had threatened to come to the shop and kill himself.

Sharon's customer, Lois Whitaker, also saw Merlo come in the door. After Sharon and Merlo had been in the back room, Sharon came out first and began working on Lois. Then Merlo came out of the back room and was two feet from Lois's chair when he began shooting Sharon. According to Lois, Sharon started slumping and Merlo shot some more. When Merlo stood in front of Lois's chair, she observed that his arm was extended and the gun was in his hand. She saw no marks nor any spittle on Merlo's face. Lois further testified that she had heard a story that Merlo had put a bullet on the seat of Sharon's car about three weeks before the shooting.

Bank detective Frank Morris, who apprehended Merlo in Philadelphia, testified that Merlo laughed and stated, "[t]he papers quote me as a nonchalant killer." Merlo confessed that on the day of the murder he drank whiskey at a bar from 10 to 11 a.m., then went to the beauty shop where he talked to his wife "trying to get her to go back with him."

Robert Payton testified that he was seeing Sharon Merlo prior to the birth of her son, and, in October 1966, four weeks after the birth. After Sharon filed for divorce, Payton saw her a few times a week, picking her up at her parents' house. Sharon told Payton that Merlo had threatened to go to the beauty shop and shoot himself.

Diane Wilshire, Sharon's sister, testified that Merlo visited her in the hospital in December 1966, and that he had a gun with him. She also testified that Merlo once hit Sharon, breaking her glasses.

John Merlo gave the following testimony at the trial. He and Sharon were married in April 1966, and their son was born in September of that year. On October 13, 1966, he and Sharon had an argument and Sharon threw him out of the house, which was her mother's. On October 29, Sharon and John went to a drive-in where Sharon told John she wanted a divorce. Apparently, Merlo returned to the house and was thrown out again on November 5. On November 7, Merlo saw Payton and Sharon "necking" in a parked car in front of the house. Merlo confronted the two and told Sharon, "no dating." Merlo had returned to his car and was slowly pulling away when Sharon ran up to the car, reached in the window, and slapped Merlo. Merlo then stopped the car and chased Sharon. When he caught her he "slapped her a couple times," breaking her glasses.

Merlo left for his hometown of Niles, Ohio, but returned to Michigan on December 14, with a gun. He visited Sharon's sister in the hospital and told her that he would use the gun on himself if he did not get Sharon back. Merlo then called his mother-in-law and told her that he was going to go to the beauty shop and kill himself if he did not get Sharon back. Merlo next went to Payton's apartment looking for Sharon and Payton. They were not there, but Merlo waited in the parking lot for them to return. While waiting, he saw Sharon's car at a nearby gas station. Merlo smashed the dashboard of the car and pulled out the spark plug wires. Merlo testified that he did not place a bullet on Sharon's car seat at that time, but that one just flew out when he was smashing the dashboard with his gun.

On January 6, 1967, Merlo went to the bar next to the beauty shop and had about eight drinks. He then went into the beauty shop, intending to shoot himself if Sharon would not come back to him. Sharon refused to go back to Merlo and told him "why don't you leave," and "get out of here, punk." Sharon complained about what Merlo did to her car, spit in his face, shoved him up against the wall, and said "get the hell out of here, punk. Get out of

my life." Merlo testified that when he shot his wife he was in a rage and that part of the reason he killed her was because she had a boyfriend.

Merlo's mother-in-law, Lillian Kamen, testified as a rebuttal witness that after the killing Merlo called her and said "I'm not sorry I did it. I warned her ahead of time. I left a bullet in the front seat." Kamen also testified that Merlo had called her previously and told her he planned to go to the beauty parlor and kill himself.

After both sides had rested, the defense sought to have the case dismissed on the ground that there was insufficient evidence of premeditation. The defense counsel told the court "that the Defendant's position in this case was that he had had enough to drink where he wasn't in full control of his facilities and that further that when she spit in his face, that he lost his head and was provoked into such a state of mind that he didn't have enough time to control this excited mind and walked right behind her to where she sat down and got shot." The court denied the motion for dismissal.

The trial court subsequently gave the following jury instruction, which the parties agree violates the rule of *Sandstrom v. Montana:*

> The law presumes that every person, unless relieved by some disability as hereinafter mentioned, contemplates and intends the natural, ordinary, and usual consequences of his own voluntary acts, unless the contrary appears from the evidence, and if a man is shown by the evidence, beyond a reasonable doubt, to have killed another by an act, the natural and ordinary consequences of which would be to produce death, then *it will be presumed that death of the deceased was designed by the slayer*, unless the facts and circumstances of the killing, or the evidence, create a reasonable doubt whether the killing was done purposely. (Emphasis added).

On January 27, 1985, the district court granted Merlo's petition for a writ of habeas corpus. The district court found that

this instruction violated due process under *Sandstrom* and found that, because Merlo's sole defense was lack of intent, the error was not harmless. Respondent appealed and, on September 1, 1985, we remanded the case to the district court to determine whether Merlo was barred from maintaining this action due to a procedural default. In our unpublished opinion we stated that "[c]ounsel for the State conceded at oral argument that the ... jury instruction ... is unconstitutional," and concluded that "[c]ounsel's concession leaves as the major issue on appeal the question" of procedural default. *Merlo v. Bolden*, 774 F.2d 1163 (6th Cir.1985). On December 27, 1985, the district court ordered the writ granted, holding that the state had never raised the issue of procedural default in the state courts but instead had addressed the issue solely on the merits.

## II.

■ The state argues that Merlo's failure to raise the *Sandstrom* issue on direct appeal in the state courts should bar him from raising the issue now absent a showing of cause and prejudice. It is clear that a petitioner must demonstrate cause and prejudice when a state court denies relief due to procedural default. *Gilbert v. Parke*, 763 F.2d 821, 824 (6th Cir.1985). Further, "where the state argued both the merits and the procedural default in its state court brief and where the state court decision does not indicate whether the court relied upon the procedural default, the procedural default must be regarded as

a substantial basis of the state court's decision." *Id.*

In this case, however, the district court found that "respondent concedes that the prosecutor did not expressly raise the procedural default issue in his responsive brief before the Michigan Court of Appeals or the Michigan Supreme Court." Accordingly, the district court properly concluded that since procedural default was not argued in the state courts, the state courts denied relief based on the merits of Merlo's claims. The state, by failing to assert procedural default, waived the right to assert it as an independent ground to support Merlo's conviction. We discern no error in the district court's analysis.

## III.

■ The dispositive questions in this case are whether a *Sandstrom* error can ever be considered harmless when the defendant has contested the element of intent, and, if so, whether the *Sandstrom* error in the present case was in fact harmless.[1] The recent Supreme Court decision of *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) is dispositive on the former question and instructive on the latter.

In *Rose*, the Court resolved the question which it had failed to resolve in *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983): "whether the harmless error standard of *Chapman v. California*, 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967), applies to jury instructions that violate the principles of *Sandstrom v. Montana*, 442 U.S. 510 [99 S.Ct. 2450, 61

---

1. Two subsidiary issues are raised by the parties. First, Merlo argues that all issues with respect to the appeal except for the procedural default issue were decided by the panel which first heard the case. This argument can be rejected because the panel never discussed whether the *Sandstrom* error was harmless or not, and the issue of procedural default appropriately precedes such consideration. Second, the State argues that *Sandstrom* should not apply retroactively to cases in which the judgment and all direct appeals were final by the date of *Sandstrom*. At the same time, the State recognizes that we have given *Sandstrom* full retroac-

tive effect. "Retroactive application of *Sandstrom* has been recognized in this Circuit since the instructional error would normally affect a defendant's right to a fair trial and impact upon the ultimate issue of innocence or guilt." *Conway v. Anderson*, 698 F.2d 282, 284 (6th Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3092, 77 L.Ed.2d 1352 (1983) and cases cited therein. Subsequent cases have applied *Sandstrom* retroactively. *Logan v. Abshire*, 778 F.2d 283 (6th Cir.1985); *Martin v. Foltz*, 773 F.2d 711 (6th Cir.1985). In light of our Circuit precedent on this issue, we have no occasion to reconsider the retroactivity of *Sandstrom*.

L.Ed.2d 39] (1979), and *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)." *Rose*, 106 S.Ct. at 3103 (footnote omitted). The court reviewed the general principle first recognized in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), " 'that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt,' " *id.* 106 S.Ct. at 3105 (quoting *Delaware v. Van Arsdall*, 475 U.S. —, — 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)), and noted that this principle had been applied to myriad constitutional errors. The Court further recognized, however, that there are certain constitutional errors which render a trial so fundamentally unfair that they necessarily require reversal without regard to the evidence in the record.[2] However, those errors, as the Court explained, "are the exception and not the rule." *Rose*, 106 S.Ct. at 3106. The Court observed that the purpose of many criminal trial rules is to ensure a fair trial and concluded that "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Id.* at 3107.

The Court found that a *Sandstrom* error is not the kind of error that automatically requires reversal and therefore found "that the error at issue here—an instruction that impermissibly shifted the burden of proof on malice—is not 'so basic to a fair trial' that it can never be harmless." *Id.* The Court accordingly held that the *Chapman* harmless error standard applies to all cases involving *Sandstrom* errors.[3]

In so holding, the Court rejected the approach which this court had taken in the decision below. In *Clark v. Rose*, 762 F.2d 1006 (6th Cir.1985), we held that because the defendant had contested the issue of intent at trial, the *Sandstrom* error could not be harmless. *See Rose*, 106 S.Ct. at 3105. For support for this proposition, we relied on Circuit precedent, namely, *Engle v. Koehler*, 707 F.2d 241, 246 (6th Cir.1983), *aff'd by an equally divided Court*, 466 U.S. 1, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984). *Id. Engle* held that certain *Sandstrom* errors could be harmless and set forth the following analysis:

> If the defendant acknowledges that an intentional, malicious killing occurred and only claims nonparticipation, then a *Sandstrom* instruction may be harmless. Conversely, if the defendant asserts lack of *mens rea*, a *Sandstrom* instruction can be extremely prejudicial even if overall proof of intent or malice is substantial.

*Engle*, 707 F.2d at 246. This analysis was based on *Conway v. Anderson*, 698 F.2d 282 (6th Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3092, 77 L.Ed.2d 1352 (1983) (observing the extremely prejudicial effect of a *Sandstrom* error where the defendant challenged the element of *mens rea* ), and was approved in *Martin v. Foltz*, 773 F.2d 711, 719 (6th Cir.1985) (finding a *Sandstrom* error to be harmless because the *sole* question at trial was whether the defendant was a participant in the crime).

The Supreme Court in *Rose* expressly rejected this court's analysis in vacating our decision. The Court stated:

> our harmless error cases do not turn on whether the defendant conceded the factual issue on which the error bore. Rather, we have held that "*Chapman* mandates consideration of the entire

---

**2.** Examples of such errors include the use of a coerced confession, *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), the complete denial of counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and the denial of trial by an impartial judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). *See Chapman*, 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8.

**3.** The Court did not conclude that all *Sandstrom* errors are necessarily harmless. It merely concluded that the traditional *Chapman* harmless error analysis may be applied to determine whether an erroneous *Sandstrom* instruction is in fact harmless under the circumstances.

record prior to reversing a conviction for constitutional errors that may be harmless." ... The question is whether, "on the whole record ... the error ... [is] harmless beyond a reasonable doubt." ... Thus, the fact that respondent denied that he had "an intent to do any injury to another," ... does not dispose of the harmless error question.

*Rose,* 106 S.Ct. at 3109 (citations omitted).

Thus, to the extent that *Conway, Engle* and *Martin* instruct that a *Sandstrom* error cannot be harmless where a defendant challenges the element of *mens rea,* they are modified by *Rose* and no longer represent the correct statement of the law in this Circuit. In light of *Rose,* our determination of whether a *Sandstrom* instruction is harmless will no longer be "largely a function of the defense asserted at trial." *Engle,* 707 F.2d at 246; *see also Conway,* 698 F.2d at 285. Rather, we will apply the traditional *Chapman* harmless error analysis to determine whether the record, examined in its entirety, establishes guilt beyond a reasonable doubt. The specific inquiry in a *Sandstrom* case will be "whether the evidence was so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Connecticut v. Johnson,* 460 U.S. 73, 97 n. 5, 103 S.Ct. 969, 973 n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting) (approved in *Rose v. Clark,* 106 S.Ct. at 3109).

Applying this standard to the present case, we cannot say that the instant *Sandstrom* error was harmless beyond a reasonable doubt. Merlo was convicted of first degree murder which proscribes "wilful, deliberate and premeditated murder." Mich.Comp. Laws Ann. § 750.316. Merlo's theory at trial was that he had gone to the shop to shoot himself, had made prior threats to shoot himself in the shop, and, in a drunken condition, was incited to shoot his wife by her verbal and physical abuse. Merlo introduced evidence at trial to support this theory. The state's theory, also supported by the evidence, was that Merlo had previously abused his wife, had left a

bullet in her car as a warning, was jealous of her relationship with her new boyfriend, and shot her with the requisite intent of premeditation. Of course, the mere fact that Merlo disputed the element of intent is not dispositive. However, the evidence is in such a balanced state that we cannot say beyond a reasonable doubt that it "was so dispositive of intent ... that the jury would have found it unnecessary to rely on the presumption" created by the erroneous *Sandstrom* instruction. *Connecticut v. Johnson,* 460 U.S. at 97 n. 5, 103 S.Ct. at 973 n. 5 (Powell, J., dissenting). We therefore cannot conclude that the *Sandstrom* error was harmless.

Accordingly, the judgment of the district court is AFFIRMED.