**Lawrence D. JOHNSON,
Petitioner–Appellant,**

v.

**Luella BURKE, Respondent–Appellee.**

No. 89–1684.

United States Court of Appeals,
Sixth Circuit.

Argued April 3, 1990.
Decided May 22, 1990.

Arthur J. Tarnow (argued), Detroit, Mich., for petitioner-appellant.

Thomas Chambers (argued), Office of the Pros. Atty., Detroit, Mich., Suzanne L. Wilhelm, Office of the Atty. Gen., Appellate Div., Lansing, Mich., for respondent-appellee.

Before KRUPANSKY and MILBURN, Circuit Judges; and THOMAS, Senior District Judge *.

* Honorable William K. Thomas, Senior United States District Judge for the Northern District of

MILBURN, Circuit Judge.

Petitioner Lawrence David Johnson, a state prisoner in Michigan, appeals the dismissal by the district court of his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. For the reasons that follow, we affirm.

## I.

### A.

Johnson was convicted by a jury on December 6, 1974, of one count of first-degree murder and one count of manslaughter. The Michigan Court of Appeals affirmed his conviction on direct appeal (*see People v. Johnson*, 71 Mich.App. 602, 248 N.W.2d 633 (1977)), and the Michigan Supreme Court denied Johnson's petition for review on February 16, 1977.

Johnson made four unsuccessful attempts at obtaining postconviction relief in state courts between 1977 and 1987. This appeal arises from Johnson's application for leave to file a delayed motion for a new trial, which he filed in the Detroit Recorder's Court in early 1987. In an order issued May 28, 1987, the Recorder's Court denied Johnson's application.

On January 7, 1988, the Michigan Court of Appeals denied Johnson's application to file a delayed appeal because of "lack of merit on the grounds presented." On January 11, 1988, the Michigan Supreme Court denied Johnson's petition for review.

On August 15, 1988, Johnson petitioned the district court for a writ of habeas corpus. The district court denied Johnson's petition in a decision issued May 17, 1989.

### B.

Johnson's convictions arose from events that transpired on the night of June 29, 1973, at the Hi–Life Bar in Detroit. Johnson, his brother Olen, and a friend, Mark Robinson, spent most of the day drinking beer together. They settled into the Hi–

Ohio, sitting by designation.

Life by 5:00 p.m., where they continued drinking beer. Bartender Nancy Ayers testified that one of the shooting victims, Joseph Battle, entered the bar at approximately midnight. Ayers testified that Battle appeared to be dancing by himself toward the jukebox when he bumped into Johnson's table, spilling Johnson's and his friends' drinks. Robinson testified that when Battle walked past, he attempted to take a beer and some dollar bills that were on Johnson's table, but Robinson did not report this to the officers at the scene.

Johnson and Battle exchanged words and then exchanged blows. It was disputed whether Johnson had a pistol himself or whether he took Battle's. Regardless, Johnson ended up with a pistol, which Ayers and other bar patrons said he used to beat Battle's head.

Borders Alvin "Pops" Henderson attempted to stop the fight, first verbally, and then by pulling the men apart. A shot was fired, and Henderson backed away from the fight. He then stumbled to the bar next door, asked the clean-up man to call the police, opened his shirt to reveal his chest wound and dropped dead.

Johnson and his two companions fled the bar immediately after Henderson was shot. A few minutes later, however, Johnson returned to the bar and found Battle still lying on the floor. He yelled, "You rotten nigger, I'll make sure you're dead," and shot Battle four times. Johnson then waved the pistol in the air, yelled that he would shoot anyone who tried to pursue him, fired one shot in the direction of the bar, and ran out of the building again. Battle died of gunshot wounds to his neck, chest, and abdomen. Henderson died of a single gunshot wound in his chest. Both died from .22–caliber long rifle bullets that were fired from the same gun.

Johnson fled the state but was extradited to Michigan and charged with the first-degree murder of Battle and the second-degree murder of Henderson. At his trial, Johnson raised the defenses of self-defense and insanity, and he was represented by separate counsel on each charge.

As required by state law, the prosecution called several res gestae witnesses, including Johnson's brother, Olen, and Mark Robinson, both of whom offered exculpatory testimony. While impeaching them, as he was free to do under Michigan law, the prosecutor elicited testimony from Olen that he never went to the police with his exculpatory information about his brother's role in the shootings. Similarly, the prosecutor elicited testimony from Robinson that conflicted with the statement he gave to police immediately following the shootings.

The defense called psychiatrist Dr. Emanuel Tanay, who testified that Johnson was traumatized through childhood beatings, shooting deaths of family members, and head injuries he received in car accidents. Dr. Tanay testified that it was his opinion that Johnson was afraid of guns and became very excitable around them, and that the circumstances at the Hi–Life Bar caused him to become unable to control his behavior or to distinguish right from wrong.

On cross-examination, the prosecutor attempted to discredit Dr. Tanay's opinion by emphasizing that it was based upon a single, hour-long interview with Johnson that occurred fourteen months after the shootings, and that the doctor had learned the facts of the case solely from Johnson himself. During cross-examination, the prosecutor also brought out that Johnson had been extradited for trial and that he had possessed a gun several months after the shootings.

The jury was instructed on first- and second-degree murder, manslaughter, self-defense, insanity, and the general verdict of not guilty. In its manslaughter instruction the trial court stated, contrary to the holding in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), "The law implies from the unprovoked, unjustifiable excusable killing, the existence of that wicked disposition which the law terms malice aforethought. If a man kills another suddenly without provocation, the law implies malice and the crime is murder." The jury convicted Johnson of first-degree murder of Battle and of man-

slaughter in Henderson's death, apparently ignoring the trial court's erroneous instructions.

The Recorder's Court denied Johnson's application for leave to file a delayed motion for a new trial because his application did not

> reflect upon its face any basis for concluding that relief is warranted or that defendant has been denied a fair opportunity in raising the issues discussed or having been raised; that such issues have not been duly considered.

The Recorder's Court also stated that "merit in the grounds asserted is not evident on the face of the application."

While Johnson's petition for a writ of habeas corpus was pending in the district court, the United States Supreme Court decided in *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) that

> a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar.

The district court issued its decision denying Johnson's petition approximately three months after the Court issued its decision in *Harris.* Yet the district court did not mention *Harris* in its decision, but instead dismissed Johnson's claim of denial of due process because he did not object to the jury instructions at trial and could not show cause and prejudice for his failure to object. The district court dismissed Johnson's claims of ineffective assistance of counsel on the ground that they did not satisfy *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and then dismissed his claims of prosecutorial misconduct on the ground that the questions with which Johnson took issue elicited admissible evidence.

The principal issues presented in this appeal are: (1) whether the trial court's jury instructions deprived Johnson of due process of law by improperly shifting the burden of proof; (2) whether Johnson was denied the effective assistance of counsel; and (3) whether the prosecutor's conduct denied Johnson due process of law.

## II.

### A.

As noted above, the district court did not consider the implications of *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), in its denial of Johnson's petition. *Harris* directs federal courts to consider federal claims brought by state prisoners "unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." 109 S.Ct. at 1043. Respondent concedes the applicability of the *Harris* plain statement rule to Johnson's petition, but contends that a plain statement of reliance on state procedural grounds can be found in the record filed in this appeal.

Respondent argues that *Harris* should be interpreted to direct the federal courts to look to the last determinative state court decision in a petitioner's case. Respondent gives no indication as to what constitutes a "determinative" decision. Rather, respondent asserts that in this case, we should look to the Recorder's Court's denial of Johnson's application to file a delayed appeal. Respondent then argues that a denial of an application is inherently a decision that relies on procedural grounds, and thus, respondent concludes, the plain statement rule of *Harris* has been satisfied. Respondent dismisses the Michigan Court of Appeals' and Michigan Supreme Court's orders denying Johnson's applications to file delayed appeals to be "merely orders denying review" of a procedural decision. We find respondent's arguments, uncluttered as they are by explanation or justification, to be wholly without merit.

The Supreme Court granted certiorari in *Harris* to resolve the conflict within the circuits "over the standard for determining whether a state court's ambiguous invocation of a procedural default bars federal habeas review." *Harris,* 109 S.Ct. at 1041 & n. 4. The Court explained that the procedural default rule had its origin in the

" 'adequate and independent state ground' doctrine," and attributed much of the confusion among the federal courts to the fact that "[t]he question whether a state court's reference to state law constitutes an adequate and independent state ground for its judgment may be rendered difficult by ambiguity in the state court's opinion." *Id.* at 1042.

The Court concluded that adopting the plain statement rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), in habeas cases would help eliminate the confusion that was bound to arise when federal courts second-guessed ambiguous state court decisions on state law. *Harris*, 109 S.Ct. at 1043. The Court explained that its decision would also serve the interests of federalism and comity, as state courts are familiar with the plain statement rule, and can "rely on a state procedural bar and thereby foreclose federal habeas review to the extent permitted by [*Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ]", *id.* 109 S.Ct. at 1044, by "rendering a judgment in the case [that] 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 109 S.Ct. at 1043 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985)).

Adopting respondent's proposed rule that federal courts should look for a plain statement of reliance upon a state procedural bar in the last "determinative" state court judgment would frustrate *Harris*, if not contradict it, by returning us to second-guessing the state court's determinations of state law. Moreover, it would deprive the state courts of the benefits of *Harris* and leave each state court wondering whether its decision would be deemed "determinative" in federal habeas review.

Similarly, *Harris* leaves no room for respondent to argue that the inherent nature of a state court's denial of an application to file a motion for a new trial is a plain statement of reliance upon state procedural grounds. Finally, we note that respondent's arguments overlook the Recorder's Court's finding that Johnson's federal claims were without merit. Clearly, the Recorder's Court addressed the merits of Johnson's claims.

■ In *Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979), the Supreme Court held that jury instructions that implied malice if "the prosecution established that the homicide was both intentional and unlawful" erroneously shifted to the defendant the burden of proof on the issue of malice and intent. In *Rose v. Clark*, 478 U.S. 570, 582, 106 S.Ct. 3101, 3108, 92 L.Ed.2d 460 (1986), the Court held that *Sandstrom* errors should be reviewed using the harmless error standard. In *Rose*, the defendant raised the defense of insanity, but was convicted of one count of first-degree murder and one count of second-degree murder after the trial court gave the jury instructions that violated *Sandstrom*. *Id.* 478 U.S. at 573–74, 99 S.Ct. at 3103–04. In seeking habeas relief, the defendant argued that *Sandstrom* violations could never be harmless errors because the issue of intent was critical in his and every murder case.

The Supreme Court rejected this argument, explaining that *Sandstrom* was based on the rule that "only the guilty are criminally punished," and "[w]hen the verdict of guilty reached in a case in which *Sandstrom* error was committed is correct beyond a reasonable doubt, reversal of the conviction does nothing to promote the interest that the rule serves." *Id.* at 580, 99 S.Ct. at 3107. The Court also noted that in many cases, the erroneous instruction is superfluous because "the predicate facts conclusively establish intent," such that no rational jury could find that the accused committed the offense but did not intend to do it. *Id.* at 580–81, 99 S.Ct. at 3107–08.

We have held *Sandstrom* error to constitute reversible error where the evidence against the defendant was in "such a balanced state that [we could not] say beyond a reasonable doubt that it 'was so dispositive of intent ... that the jury would have found it unnecessary to rely on the presumption' created by the erroneous *Sandstrom* instruction." *Merlo v. Bolden*, 801 F.2d 252, 257 (6th Cir.1986) (quoting *Connecticut v. Johnson*, 460 U.S. 73, 97 n. 5,

103 S.Ct. 969, 983 n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting)), *cert. denied,* 480 U.S. 909, 107 S.Ct. 1358, 94 L.Ed.2d 527 (1987); *see also Alexander v. Foltz,* 838 F.2d 140, 148 (6th Cir.), *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988). Conversely, we have held that a *Sandstrom* error was harmless where a defendant charged with first-degree murder effectively conceded the issue of intent by raising the defense that he was insane and incapable of knowing right from wrong. *Cook v. Foltz,* 814 F.2d 1109, 1112–13 (6th Cir.), *cert. denied,* 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 77 (1987).

We cannot distinguish this case from *Rose* and *Cook* in any meaningful way. Therefore, we conclude that the *Sandstrom* error was harmless and Johnson received a fair trial. The fact that Johnson was convicted of the lesser-included-offense of manslaughter in Henderson's killing demonstrates that the jury ignored the erroneous instruction. Moreover, Johnson had full opportunity to present his case, and the state's evidence was so strong against him " 'that the jury would have found it unnecessary to rely on the presumption' created by the erroneous *Sandstrom* instruction." *Merlo,* 801 F.2d at 257.

### B.

Johnson had two attorneys at trial: Arthur Arduin on the first-degree murder count and Harry Pliskow on the second-degree murder count. Johnson argues that his trial attorneys' conduct denied him the effective assistance of counsel. In reviewing this claim, we are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). To prevail under *Strickland,* Johnson must show that his counsel's performance was deficient and so prejudicial that but for the deficient conduct, the outcome of the trial probably would have been different. *Id.* at 694, 104 S.Ct. at 2068.

■ Johnson first argues that his attorneys "destroyed" his insanity defense by occasionally misstating his and the state's burdens of proof. Yet we note that Arduin correctly stated the burdens of proof under the insanity defense in his summation. More significantly, immediately after sending the jury into deliberation, the trial court recalled the jury to the courtroom and specifically and correctly instructed it on the burdens of proof under the insanity defense. We agree with the district court that the attorneys' misstatements were not so egregious as to constitute deficient representation. Moreover, even if counsels' misstatements were evidence of deficient performance, Johnson has not shown the prejudice required to satisfy the second *Strickland* prong.

Johnson next argues that Arduin breached the *Strickland* standard in his remarks regarding psychiatrists and his treatment of bartender Ayers. Ayers testified as a prosecution witness, while Dr. Emanuel Tanay testified about Johnson's mental status.

■ During jury voir dire and again in his summation, Arduin used the term "shrink" in a deprecating, sarcastic manner to urge the jury not to be prejudiced against psychiatrists and testimony pertaining to Johnson's mental status. Johnson argues that the use of the term shrink somehow deprived him of the right to present his defense. We conclude that Arduin's use of the term shrink did not constitute deficient representation.

■ Johnson also argues that Arduin was deficient in attacking Ayers' credibility by calling her a "low down bar maid" and in asking her to demonstrate for the jury how Battle looked when he danced from the bar to the jukebox by himself. Arguably, the request to demonstrate Battle's method of ambulation was relevant to Ayers' claim that she had an unobstructed view of the conflict. Arduin's request was neither inexplicable nor so outrageous that merely posing it constituted deficient legal representation. Similarly, we find that Arduin's method of impeaching Ayers was within the "wide range of reasonable pro-

fessional assistance" contemplated by *Strickland.*

■ Johnson also complains that Pliskow was deficient in his representation by failing to elaborate on the insanity defense in his summation. Pliskow gave his summation after Arduin, who spent a great deal of time on the insanity defense. We find Johnson's claim is meritless because an attorney is not professionally deficient because he wishes to avoid redundancy. Moreover, the record indicates that Arduin was the primary proponent of the insanity defense, which he attempted to raise to counter the element of premeditation in the charge of the first-degree murder of Battle. It also appears from the record that Pliskow was the primary proponent of the defense of self-defense, which could be applied plausibly only to the Henderson shooting. Pliskow represented Johnson on the latter count, and therefore, it seems especially reasonable that he focused his summation on the tumult of the bar fight and the dangers Johnson perceived. For these reasons, we reject Johnson's attack on Pliskow's representation.

### C.

■ Johnson's third claim for relief is one of prosecutorial misconduct. Review of this claim is guided by the inquiry of whether the alleged misconduct deprived Johnson of a fundamentally fair trial. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d 431 (1974). The harmless error standard applies to claims of prosecutorial misconduct. *See Eberhardt v. Bordenkircher,* 605 F.2d 275, 278 (6th Cir.1979).

Dr. Tanay testified that Johnson probably could not distinguish right from wrong or control his impulses during the events at the Hi–Life Bar. The prosecutor sought to discredit Dr. Tanay's opinion by emphasizing what he considered to be its weak foundation. During his cross-examination, the prosecutor asked Dr. Tanay if he was aware that Johnson had fled the state, which the doctor was. He then asked if the doctor was aware that Johnson had not returned voluntarily, but had to be extra-dited. Before the doctor could answer the question, defense attorney Arduin objected to the mention of Johnson's extradition.

It appears that Arduin thought that the prosecutor and the defense attorneys had some type of pretrial agreement that the extradition would not be mentioned at trial. No record of any such agreement is included in the record of this appeal. The prosecutor apologized if they had reached such an agreement and withdrew the question. The trial court instructed the jury to disregard any mention of extradition.

Dr. Tanay also testified on direct examination that because of shooting deaths in his family and other traumatic events in his past, Johnson was generally afraid of guns. On cross-examination, the prosecutor asked Dr. Tanay if he was aware that Johnson had possessed a gun in March 1974, several months after the shooting in the Hi–Life Bar. The doctor responded that he was not.

Arduin then objected to any mention of Johnson's prior arrests. Arduin argued that the prosecutor had agreed not to mention Johnson's past criminal activity and prior arrests. The prosecutor responded that he had only asked about the doctor's knowledge of Johnson's possession of a gun to contradict the doctor's statement that Johnson was afraid of guns. The trial court sustained the objection, and nothing else was mentioned at trial about Johnson's possession of guns.

On appeal, Johnson asserts that by introducing the fact that he had been extradited and then asking Dr. Tanay about Johnson's possession of a gun in March 1974, the prosecutor deliberately inflamed the jury and denied him of a fair trial. These arguments are without merit.

■ As the district court found, the prosecutor's question regarding Johnson's extradition was admissible under Michigan law because it showed flight, which was relevant to a consciousness of guilt. *See People v. Mindeman,* 157 Mich. 120, 121–22, 121 N.W. 488, 489–90 (1909); *People v. Stull,* 127 Mich.App. 14, 17, 338 N.W.2d 403, 406 (1983).

■ With regard to the prosecutor's question of Dr. Tanay's awareness of Johnson's possession of a gun in March 1974, we note that under Michigan law, "[t]estimony of prior arrests, convictions, assaultive and antisocial conduct, ordinarily completely inadmissible as bearing on the general guilt or innocence of the accused" becomes material and admissible when the defendant rebutts the presumption of sanity, thereby forcing the state to prove his sanity. *People v. Woody*, 380 Mich. 332, 334, 157 N.W.2d 201, 203 (1968); *see also People v. Simonds*, 135 Mich.App. 214, 217, 353 N.W.2d 483, 486 (1984) (per curiam). Thus, by raising the insanity defense and supporting it with Dr. Tanay's opinions, Johnson opened the door to the otherwise possibly inadmissible evidence regarding his possession of a gun.

■ In his summation, the prosecutor said Dr. Tanay's opinion of Johnson's mental status was "an interesting explanation" of Johnson's behavior in the Hi–Life Bar, but he did not find it to be persuasive. Johnson asserts that this statement amounted to a comment on Johnson's choice not to testify at his trial. This argument is completely meritless, as the contested remarks clearly refer to Dr. Tanay's testimony.

■ Johnson next argues that the prosecutor "shifted the burden of proof" in questioning Olen Johnson, the defendant's brother, who was drinking with the defendant when the shooting occurred. Olen was a res gestae witness whom the prosecutor was required to call to testify. *See* Mich.Comp.Laws Ann. §§ 767.40–767.40a; *People v. Castenada*, 81 Mich.App. 453, 458, 265 N.W.2d 367, 372 (1972). Consequently, under Michigan evidentiary rules, the prosecutor was free to impeach Olen Johnson. Mich.Comp.Laws Ann. § 767.40a; *Castenada*, 265 N.W.2d at 372.

Olen's direct testimony completely exculpated his brother. On cross-examination, the prosecutor asked Olen why he never went to the police after the shooting and told them his version of the shooting. Olen responded that he knew the police were interested in his brother, but he never gave his statement to them. Johnson does not explain how the prosecutor's questions "shifted the burden of proof" or why the prosecutor's questions were impermissible. We find Johnson's claim to be so meritless as to verge on the absurd.

Similarly, Johnson argues that the prosecutor's examination of Mark Robinson was also impermissible. Robinson was another res gestae witness whom the prosecution was required to call. Robinson's testimony, which exculpated Johnson in the shootings, conflicted with the statement he gave to the police shortly after the shootings.

In laying a foundation to introduce his statement to the police after the shootings for the purpose of impeaching Robinson, the prosecutor asked him if he had talked with anyone about the shootings. Robinson replied that he had spoken with the police and with defense attorney Arduin. In follow-up questions, the prosecutor did not mention the contact with Arduin but kept his attention on the police statement. Later, Arduin elicited from Robinson the testimony that in their pretrial conference, he had told Robinson to tell the truth at trial.

Johnson argues that when the prosecutor elicited from Robinson the fact that he had talked with Johnson's attorney before trial, the prosecutor violated Johnson's Sixth Amendment right to counsel by raising "inferences." He argues that for attorneys to prepare for a case, not only must they interview witnesses, but the fact that the interviews have taken place must be kept from the jury.

■ First, it is obvious from a reading of the transcript that the prosecutor was laying the foundation to impeach Robinson based upon his statement to the police. There is no indication that the prosecutor expected Robinson to say that he had talked with Arduin, and the prosecutor did not follow up on that revelation in subsequent questions. A prosecutor is not guilty of misconduct where he receives an unexpected answer to a permissible question. *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir.1984). Second, there is

no Sixth Amendment right to keep the fact of attorney-witness pretrial interviews from the jury, and Johnson advances no valid reason for the creation of such a right.

Thus, considered separately or together, none of Johnson's attacks on the prosecutor's behavior at trial show any misconduct. Moreover, even if misconduct is assumed, Johnson has not shown how that behavior deprived him of any specific constitutional right or fundamental fairness. Therefore, we reject his claim of prosecutorial misconduct as meritless.

### III.

Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.