**Porfidio Rae ACOSTA, Petitioner,**

v.

**John MAKOWSKI, Respondent.**

**Civ. A. No. 89CV–71907–DT.**

United States District Court,
E.D. Michigan, S.D.

Jan. 3, 1991.

Porfidio Rae Acosta, in pro. per.

K. Davison Hunter, Asst. Atty. Gen., Lansing, Mich., for respondent.

## MEMORANDUM OPINION AND ORDER

COHN, District Judge.

Petitioner, Porfidio Rae Acosta, presently confined at the Michigan Department of Corrections' Muskegon Temporary Facility in Muskegon, Michigan, has filed this *pro se* application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 23, 1967, a jury in Oakland County Circuit Court convicted petitioner of the first degree murder of his girlfriend. The trial judge sentenced him to life imprisonment. The Michigan Court of Appeals affirmed the conviction and sentence, *People v. Acosta*, 16 Mich.App. 249, 167 N.W.2d 897 (1969); the Michigan Supreme Court denied leave to appeal, *People v. Acosta*, 403 Mich. 801 (1978). On September 8, 1978, petitioner sought a writ of habeas corpus in this Court; Judge Charles W. Joiner subsequently denied the petition. (*Acosta v. Cason*, No. 78–72320, February 7, 1980).

In 1984, petitioner moved for a new trial raising the issues now before this Court. The trial court denied the motion, and the Michigan Court of Appeals declined to grant leave to appeal. The Michigan Supreme Court in lieu of granting leave to appeal remanded the case to the Court of Appeals for consideration as on leave granted; *see People v. Acosta*, 425 Mich. 883, 392 N.W.2d 1 (1986). The Court of Appeals again affirmed the conviction; the Michigan Supreme Court on February 10, 1989, denied leave to appeal being unpersuaded that relief should be granted. One justice would have appointed counsel for petitioner to pursue an application for leave to appeal.

On June 20, 1989, petitioner filed the instant application for habeas relief. He claims that: (1) the decisions of the United States Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and the Michigan Supreme Court in *People v. Wright*, 408 Mich. 1, 289 N.W.2d 1 (1980), must be given retroactive effect in this case; and (2) the trial court's instructions on intent were defective under *Sandstrom* and were not harmless error. State court remedies concerning the issues raised in this habeas petition have been exhausted. *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982).

I.

As a preliminary matter, respondent argues that the petition should be dismissed as a successive petition pursuant to Rule 9(b) of the Rules Governing Section 2254 cases. Rule 9(b) provides:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

Petitioner's first application for habeas relief contained the following claims: (1) the Michigan appellate courts erred in their interpretation of Michigan law resulting in a denial of petitioner's 1969 state court appeal; (2) the Michigan Court of Appeals did not follow legal precedent; (3) the

change in the definition of an intoxication defense under Michigan law was not applied retroactively; and (4) the indictment for the first-degree murder charge against petitioner did not contain a reference to the element of intent.

■ The current petition raises issues over the trial court's instructions to the jury and *Sandstrom*. Thus, the current petition asserts new grounds for relief, and the Court must decide whether petitioner's failure to assert these grounds in the previous petition constitutes an abuse of the writ. A dismissal pursuant to Rule 9(b) lies within the district court's discretion. *Lonberger v. Marshall*, 808 F.2d 1169, 1173 (6th Cir.), *cert. denied*, 481 U.S. 1055, 107 S.Ct. 2195, 95 L.Ed.2d 850 (1987).

If petitioner had deliberately withheld one of the grounds for federal collateral relief in his prior petition, *see Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963), or if he had been inexcusably neglectful, *see Wong Doo v. United States*, 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999 (1924), the Court might dismiss the petition. Here, however, petitioner relies on case law that was developed after he filed his first petition on September 8, 1978. *Sandstrom* was decided on June 18, 1979, and *Wright* was decided on March 4, 1980. Even if petitioner had the tools to make a similar constitutional argument in 1978, the argument would not have been persuasive absent the decision of the United States Supreme Court in *Sandstrom*. Accordingly, the Court finds no abuse of the writ and will now consider petitioner's pending claims.

## II.

■ Petitioner's first claim is that he was denied a fair trial and due process of the law. Petitioner contends that the trial judge's instructions to the jury on the element of intent impermissibly shifted the burden of proof to him and relieved the prosecution of its burden of proving guilt beyond a reasonable doubt. Petitioner argues that the state courts should have ap-

plied the rulings in *Sandstrom* and *Wright* to his case retroactively.

The Court's first task is to determine whether a *Sandstrom*-type error occurred. In *Sandstrom*, the United States Supreme Court held that the jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts, "violates the constitutional requirement that the prosecution prove every element of a criminal offense beyond a reasonable doubt.

Here, the trial judge instructed the jury that "[t]he law presumes that every man intends the legitimate consequences of his own act." (TT IV at 629–630).[1] The Court finds, as did the Supreme Court in *Sandstrom*, that

a reasonable jury could well have interpreted the presumption [on intent] as 'conclusive,' that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence—thus effectively shifting the burden of persuasion on the element of intent.

*Sandstrom v. Montana*, 442 U.S. at 517, 99 S.Ct. at 2455 (emphasis in original). Under either interpretation of the jury instruction, the jurors could have found that the prosecution was not required to carry the burden of proof regarding petitioner's state of mind. Consequently, the instruction was unconstitutional under *Sandstrom*.

## III.

■ The Court must next determine whether *Sandstrom* should be applied retroactively. The trial court held that the jury instructions violated the holding in *Sandstrom* but declined to apply *Sandstrom* noting that the Michigan Supreme

1. The transcript of trial consists of four volumes consecutively paginated from 1 to 635.

Court in *People v. Woods,* 416 Mich. 581, 621, 331 N.W.2d 707 (1982), permitted retroactive application of *Sandstrom* only "to those defendants whose cases were pending on direct appeal when *Sandstrom* was decided ... if the issue was properly raised and preserved." Because petitioner had exercised his right to appeal ten years before *Sandstrom,* the trial court ruled that *Sandstrom* could not be applied retroactively to his case. The Michigan Court of Appeals agreed that the instruction on "intent" was erroneous under *Sandstrom,* and that *Sandstrom* could not be applied retroactively to petitioner's case.

Despite state court rulings to the contrary, the Court of Appeals for the Sixth Circuit has applied *Sandstrom* retroactively. *See Merlo v. Bolden,* 801 F.2d 252, 255 n. 1 (6th Cir.1986), *cert. denied,* 480 U.S. 909, 107 S.Ct. 1358, 94 L.Ed.2d 527 (1987); *Conway v. Anderson,* 698 F.2d 282, 284 (6th Cir.1983); *Williams v. Engle,* 683 F.2d 152 (6th Cir.1982); *Burton v. Bergman,* 649 F.2d 428, 431 n. 3 (6th Cir.1981), *vacated and remanded on other grounds,* 456 U.S. 953, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982).

■ More recently, the United States Supreme Court has held that "new rules should not be applied retroactively to cases on collateral review." *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Exceptions to this general rule of nonretroactivity apply if the new rule (1) places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or (2) requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.'" *Id.* at 307, 109 S.Ct. at 1073. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (citations omitted) (emphasis in original).

*Sandstrom* followed logically from *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), in which the United States Supreme Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Additionally, the Supreme Court in *Sandstrom* relied extensively on *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), regarding conclusive presumptions, and *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), concerning burden-shifting presumptions. This leads the Court to conclude that *Sandstrom* was not a new rule under *Teague. See Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985) (mandatory presumptions measured against the standards of *Winship* as elucidated in *Sandstrom* ); *Burton v. Bergman,* 649 F.2d at 431 n. 3 (court uncertain about whether *Sandstrom* announces a new constitutional principle because "it seems to be simply an application of the principle established by *Winship* "). *See also Hall v. Kelso,* 892 F.2d 1541, 1543 n. 1 (11th Cir.1990) (*Teague* not a bar to application of *Sandstrom* ). *Cf. Prihoda v. McCaughtry,* 910 F.2d 1379, 1382 (7th Cir.1990) (*Sandstrom* not applied retroactively).

Even if *Sandstrom* did announce a new rule, its holding should be applied based on the second exception noted above. The rules in *Winship* and *Sandstrom* are implicit in the concept of ordered liberty in that they prohibit

> the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. The prohibition protects the 'fundamental value determination of our society,' given voice in Justice Harlan's concurrence in *Winship,* that 'it is far worse to convict an innocent man than to let a guilty man go free.'

*Francis v. Franklin,* 471 U.S. at 313, 105 S.Ct. at 1970 (citations omitted). The Court concludes that it must apply *Sandstrom* retroactively.

### IV.

Having found that the jury instructions were unconstitutional under *Sandstrom* and that *Sandstrom* should be applied retroactively, the Court must now consider petitioner's second claim. He argues that not only were the jury instructions on intent defective, they did not constitute harmless error.

▆▆ Under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." The harmless-error standard of *Chapman* applies to jury instructions that violate the principles of *Sandstrom. Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Whether a constitutional error is harmless under *Chapman* "is an issue of federal law to be reviewed *de novo." Cooper v. Scroggy,* 845 F.2d 1385, 1393 n. 3 (6th Cir.1988).

Because "the harmless error inquiry is fact specific and requires an analysis of the particular facts at hand", *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1097 (6th Cir.1990), the Court must review the facts. The statement of facts as described by the trial court in its opinion denying a new trial adequately relate the evidence at trial:

> Some time between 11:00 p.m. on July 6, 1967 and 2:00 a.m. the succeeding day, Anne McBee, accompanied by Linda Arnold, drove her automobile to the Keg Kanteen, a party store in Pontiac. While the automobile was parked in front of the party store, the defendant confronted Arnold, his girlfriend, who was sitting in the back seat. Entering through the rear passenger door, the defendant began to slap and kick Arnold. The defendant weighed over 220 pounds and the fifteen-year-old Arnold weighed approximately 80 to 95 pounds. The beating appears to have been precipitated by the defendant's belief that Arnold had been romantically involved with another man. The police arrived on the scene. After Arnold refused to file charges against the defendant, the police instructed Anne McBee to drive Arnold and the defendant to their home. McBee complied, driving the defendant and Arnold to the defendant's home. During the trip, the defendant made several derogatory remarks to Arnold and as he exited the automobile, stated that "he ought to cut her throat" for what she had done. When McBee departed from the defendant's home in her automobile, Arnold was conscious and in relatively good health.

> Approximately one hour later, neighbors of the defendant discovered Arnold in a fetal position lying in the street next to an automobile. Arnold did not appear to be breathing. The defendant emerged from his home carrying a glass. Referring to Arnold as his wife, the defendant stated to the on-lookers that he had beaten Arnold because she was drunk. Upon pouring the liquid from the glass onto Arnold's head, she appeared to breathe. The defendant attempted to pick Arnold up from the ground but dropped her, causing her head to strike the ground. On his second attempt, the defendant lifted Arnold and carried her along an adjoining alleyway to the rear of the defendant's home.

> The police arrived on the scene at approximately 2:15 a.m. July 7 in response to a call regarding an injured woman. At first, the defendant denied knowledge of the injured woman when questioned by the police. On further investigation, the police found Arnold lying in the defendant's back yard.

> An autopsy revealed that the fifteen-year old Arnold, who weighed approximately 90 pounds, died of multiple trauma to the head. Arnold's head and arms were bruised, blood was found in her lungs, and there was evidence of sexual abuse.

(*People v. Acosta,* Oakland County Circuit Court No. 67–2894 dated July 17, 1985).

The prosecution's theory was that the evidence was made up of a chain of circum-

stances and facts or links so connected together that they lead with reasonable certainty to petitioner's guilt beyond any reasonable doubt. (TT IV at 615). As the fact statement above indicates, the prosecution produced substantial evidence to support this theory.

Petitioner's theory at trial was that he did not know what happened on the night in question because he had consumed both drugs and alcohol in large quantity. Defense counsel argued that even if petitioner caused the death of his girlfriend, he did not have the requisite intent to commit the offense for which he was charged. (TT I at 21–22). Petitioner elicited testimony to support his claim.

The trial judge instructed the jury on first degree murder, second degree murder, manslaughter, and assault and battery. He explained that to convict petitioner on circumstantial evidence, the jury had to be satisfied beyond a reasonable doubt that each material fact or necessary link in the chain had been proved. He also explained that the question of intent was one of fact for them to decide from the evidence at trial. He said that if they did find such intent, they must consider whether petitioner was guilty of first degree murder, second degree murder, manslaughter or assault and battery. (TT IV at 611–619).

The jurors began their deliberations the same afternoon and subsequently requested legal definitions of "premeditation" and "intent." With counsel's approval, the trial judge then instructed the jurors as follows:

> Premeditation means a prior determination to do an act, but such determination need not exist for a particular period before it is carried into effect.
>
> Intent means design, resolve, or determination with which [a] person acts, being a state of mind, is rarely susceptible of direct proof, but must ordinarily be inferred from the facts. It presupposes knowledge.
>
> The question of intent is one that is hard to establish directly, because grown persons do not always disclose the object they have in view in any acts in which

they may indulge, and you have to gather the intent from the character of the act and the circumstances surrounding it and from conduct of a like character, which may appear as tending to aid you in finding and discovering it. But in connection with all this, unless the testimony satisfies you of something else, you are warranted in holding a party responsible for the natural, probable and legitimate consequences of his acts. The intent may be presumed from the doing of a wrongful, fraudulent or illegal act, but this inference or presumption is not necessarily conclusive. The law presumes that every man intends the legitimate consequences of his own acts. Wrongful acts, knowingly or intentionally committed, can neither be justified nor excused on the ground of innocent intent.

(TT IV at 629–630). Following these instructions the jurors resumed their deliberations at 4:18 p.m. and announced their verdict at approximately 4:55 p.m.

Although petitioner claimed that he lacked the necessary intent, the jury convicted him of first degree murder which required finding a "wilful, deliberate and premeditated killing." [2] The jurors apparently struggled with the issue of intent and with the choice of verdicts as indicated by their request for legal definitions of premeditation and intent. They reached a verdict soon after listening to the unconstitutional instruction on intent. The instruction about intent likely established intent in the jurors' minds regardless of the impact of drugs and alcohol on petitioner's state of mind. Therefore, the Court cannot say beyond a reasonable doubt that the instruction did not influence how at least one juror viewed the circumstantial evidence and whether petitioner had the requisite intent to commit murder in the first degree. *See Kordenbrock v. Scroggy,* at 1098.

The question remains whether, without the faulty instruction, a reasonable juror could have found sufficient evidence to infer that petitioner intended to murder his victim. Defense witness Jose Flores testi-

---

**2.** M.C.L.A. § 750.316 (1931).

fied that petitioner pursued the victim without success on two occasions on the day in question. Anne McBee testified on direct examination that petitioner slapped and kicked the victim in her car at the Keg Kanteen and threatened to "cut my throat, too" if she got out of the car. (TT I at 38–39). On cross examination McBee again testified that petitioner said he ought to cut her throat, too, and was going to kill her and everybody. (TT I at 79, 97). Petitioner resisted efforts to stop the beating at the Keg Kanteen and told more than one witness who tried to intervene to mind their own business and that he was beating the victim because he caught her with another man (TT I at 40–42). He later told a neighbor who found the victim lying in front of his house that he beat the victim because she was drunk. (TT II at 190). He then picked the victim up and carried her away. (*Id.*) The body was found in petitioner's back yard. (TT 219–224). Police Officer Harold Martin who had known petitioner for many years testified that petitioner recognized him shortly after Martin discovered the body. (TT II at 231).

Dr. Paul Flanigan testified that the victim had been severely battered about the head and also had bruises on the shoulders and arms. (TT II at 239). He said that the trauma to the head indicated that there must have been multiple blows. (TT II at 240). He also found ripped blue jeans on the victim and a cylinder of cardboard inserted into the vagina of the victim. (TT II at 242, 245–246).

The evidence at trial establishes that petitioner was clearly capable of forming the intent to inflict great bodily harm and sexual abuse on his victim. From this finding and all the other evidence, the Court concludes that a reasonable juror could have inferred from the direct and circumstantial evidence that petitioner had the requisite intent to commit first degree murder. Accordingly,

IT IS ORDERED that the petition for writ of habeas corpus is DENIED.

